

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

**ENTERED**
**06/15/2013**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 12-07018** |
| **GABRIEL G. RODRIGUEZ,** | § | **CHAPTER 7** |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| **MICHAEL SCHMIDT** | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 11-07012** |
| | § | |
| **APOLINAR RODRIGUEZ,** *et al* | § | |
| | § | |
| Defendant(s). | § | |

## MEMORANDUM OPINION

The Petitioning Creditors' Motion for Partial Summary Judgment (relating to Claim Nos. 2-10) is denied, except as it pertains to the lack of a genuine issue of material fact that they are owed certain net revenues.

The Petitioning Creditors Converted Royalties Claims (Nos. 11-19) are allowed in the following amounts:

- Apolinar Rodriguez's Claim No. 11 and Petra Rodriguez's Claim No. 12 are allowed in the amount of $88,656.75 each.

- Maria Lilia G. Henkel's Claim No. 13, Israel Guerra, Jr.'s Claim No. 14, Filiberto A. Garza's Claim No. 15, and Imelda Saenz's Claim No. 16, are allowed in the amount of $44,328.37 each.

- Mario Corona's Claim No. 17 and Hoero Corona's Claim No. 18 are allowed in the amount of $29,700.01 each.

- Blanca Corona Garza's Claim No. 19 is allowed in the amount of $29,256.73.

These claims remain subject to the ability of the Debtor and Dewey Bellows to put forth equitable arguments as to why these claims should nevertheless be disallowed or equitably subordinated.

### Facts

The procedural history of this case and its related litigation is extremely convoluted. The Court's November 16, 2012 Memorandum Opinion dealt extensively with all of the events that preceded the involuntary bankruptcy of Gabriel G. Rodriguez. (ECF No. 129).

It is not necessary to repeat all of the history again. However, the Court must explain the history of this involuntary bankruptcy case and two of the prepetition state court appellate rulings.

The Petitioning Creditors[1] filed this involuntary bankruptcy against Gabriel G. Rodriguez on September 1, 2010. (Case No. 10-70606, ECF No. 1). A default order for relief was entered on September 28, 2010. (Case No. 10-70606, ECF No. 7).

Each of the nine Petitioning Creditors filed two separate claims against the Debtor. The first set of nine claims (Nos. 2-10) is referred to by the parties as the "Trespass and Property Damages Proofs of Claim." From 1986 to 2009, the Petitioning Creditors and Debtor fought a long and protracted dispute over nine tracts of land located in Starr County, Texas. (ECF No. 47-2 at 1). The fight stemmed from a 1957 order that incorrectly probated a will. From October 2002 to October 2007, Debtor leased a portion of the land under a Salt Water Disposal Agreement ("SWDA") to Dewey Bellows Operating Company to allow Dewey Bellows to conduct commercial saltwater disposal operations. The leased land was damaged by pollution

---

[1] The term "Petitioning Creditors" refers to Apolinar Rodriguez, Petra Rodriguez, Maria Lilia G. Henkel, Israel Guerra, Jr., Filiberto A. Garza, Imelda Saenz, Maria Corona, Homera Corona, Blana Corona Garza, who are the nine creditors who filed the involuntary bankruptcy petition against Gabriel G. Rodriguez (the Debtor).

during the term of the lease, although the cause of the pollution remains disputed. Eventually the Petitioning Creditors were declared the rightful owners to the land.

The sum of these nine claims equals: (i) the alleged cost to restore the polluted land to its original condition; plus, (ii) the amount of Dewey Bellows's gross revenues traceable to the lease.[2] The total cost to restore the polluted land to its original condition was alleged to be $75,000,000.00. The total amount of Dewey Bellows's gross revenues traceable to the lease is $1,665,432.16. Each Petitioning Creditor filed a claim corresponding to the extent of their interest in the land. For example, Apolinar Rodriguez owns a 20% interest in the land and filed a claim for $15,333,086.43 (which represents 20% of the total $76,665,432.16). (Claim No. 2-2).

The Trustee objected to the Trespass and Property Damages Proofs of Claim. (ECF No. 1). The Trustee argued that the combined total of the claims ($76,665.432.16) exceeded the amount of damages (specifically, the costs to restore the land to its original condition). (ECF No. 1 at 7). Dewey Bellows joined in the Trustee's objection to the Trespass and Property damages Proofs of Claim, but also objected to the claims under additional grounds. (ECF No. 22 at 2-3).

This adversary proceeding originally combined the Trustee's and Dewey Bellows's objections to the Petitioning Creditors' Trespass and Property Damage Proofs of Claim (Nos. 2-10) with an original compliant by the Trustee against Dewey Bellows for breach of contract and a declaratory judgment for indemnity. (ECF No. 1). The Trustee argued that Dewey Bellows breached its contractual obligations to Debtor under the SWDA. (ECF No. 1 at 7-8). In addition, both the Petitioning Creditors and the Trustee argued that Dewey Bellows, pursuant to

---

[2] Additional causes of action were added when amended proofs of claim were filed. (Claim No. 2-2). These were the causes of action remaining in the Petitioning Creditors' state court case after severance from the title action. (ECF No. 47-5). Figures for the damages related to the new causes of action were not provided.

the terms of the SWDA, is contractually obligated to indemnify the Debtor.  Essentially, the Trustee and the Petitioning Creditors argued that Dewey Bellows (and not Debtor's estate) must pay any valid claim of the Petitioning Creditors related to the SWDA. (ECF No. 1 at 8-9).

The Trespass and Property Damages proofs of claim were the subject of this Court's November 16, 2012 Memorandum Opinion.  The Court disallowed the Petitioning Creditors' claims to the extent they sought to recover damages for the pollution. (ECF No. 129 at 1).[3]  As an example, Apolinar Rodriguez's Claim was disallowed in the amount of $15,000,000.00 (representing 20% of the total $75,000,000 requested for the pollution).  Summary judgment was not granted as to the remaining causes of action.

The second set (Claim Nos. 11-19) was not originally part of this adversary proceeding. These claims seek to recover royalty payments made to the Debtor.  The claims objection process proceeded before Judge Schmidt in the main bankruptcy case prior to being consolidated with this adversary proceeding and transferred to the undersigned Judge on February 5, 2013. (Case No. 10-70606, ECF No. 340).  Prior to the transfer, Judge Schmidt held a full evidentiary hearing on these claim objections. (Case No. 10-70606, ECF Nos. 203, 316-17).

After transfer and consolidation, the Court announced that the evidentiary record for these claim objections was closed.  Nevertheless, the Court allowed all interested parties to file additional posthearing briefing on Claim Nos. 11-19 (provided that the briefs did not address evidence not contained in the record).

The Debtor and Dewey Bellows filed a postpetition brief addressing issues pertaining to Claim Nos. 11-19, although they styled it as a motion for partial summary judgment. (ECF No.

---

[3] The Petitioning Creditors previously sued Dewey Bellows for the same injury in state court and collected the full amount of the judgment from Bellows.  Accordingly, they were barred from recovering against the Debtor for the same injury under Texas's "one-satisfaction" rule. (ECF No. 129 at 16-21).

164).  The Petitioning Creditors also filed a brief touching on Claim Nos. 11-19, although its primary focus was on Claim Nos. 2-10.

These briefs are the primary focus of this Memorandum Opinion.

## Analysis

### I.    Prepetition State Appellate Court Rulings

The holdings and factual background of the first two state appellate court cases are important for issues that must be addressed in this Memorandum Opinion.

#### a.  *Garza I*

The January 26, 2000 opinion issued by the San Antonio Court of Appeals is referred to as *Garza I. Garza v. Rodriguez*, 18 S.W.3d 684 (Tex. Ct. App.-San Antonio 2000) (*Garza I*).

In *Garza I*, the Petitioning Creditors appealed the dismissal of a declaratory judgment action filed in the Starr County District Court.  18 S.W.3d at 694.  The Petitioning Creditors' declaratory judgment action sought to undermine the 1957 probate order issued by the Starr County Court at Law, and which failed to account for their shifting executory interest in the disputed lease.  The San Antonio Court of Appeals held that the Starr County District Court was not permitted to interfere with the final judgment of another court of equal jurisdiction:

> By this lawsuit, appellants seek a declaration that they are the legal and beneficial owners of Pena's property due to the springing executor interest contained in Pena's will. As previously noted, however, that future interest was not accounted for in the 1957 final probate order settling, approving, and closing Pena's estate. The final order, whether by mistake or by design, unambiguously granted Santiago fee simple absolute title to the remainder of Pena's estate. That order was not challenged. The current action challenges the 1957 final probate order to the extent that appellants seek a construction of Pena's will that is contrary to what was previously determined, correctly or incorrectly, by the probate court. A court is not permitted to interfere with the final judgment of another court of equal jurisdiction. An action to undo an incorrect former judgment must be brought in the court rendering the judgment or in a higher court. Because

the instant action seeks to undo the prior probate order, the district court properly determined it did not have jurisdiction.

*Garza I*, 18 S.W.3d at 699.  The appellate court affirmed the dismissal by the Starr Country District Court.

### b.   *Garza II*

After the San Antonio Court of Appeals affirmed the dismissal by the Starr County District Court, the Petitioning Creditors refiled their action in the Starr County Court at Law on July 14, 1998.  (ECF No. 47-2).  Texas law negates the application of the statute of limitations in certain situations if the lawsuit is refiled within sixty days in a court with proper jurisdiction. TEX. CIV. PRAC. & REM. CODE § 16.064.  The Starr County Court at Law dismissed the action on the grounds that it was an impermissible collateral attack on a valid judgment. The Petitioning Creditors appealed.

On June 12, 2002, the San Antonio Court of Appeals reversed the dismissal by the Starr County Court at Law.  *Garza v. Rodriguez*, 87 S.W.3d 628 (Tex. Ct. App.-San Antonio 2002) (*Garza II*).  This opinion is referred to as *Garza II*.

The San Antonio Court of Appeals revisited the issue surrounding the 1957 final probate order. The appellate court retreated from its prior assertion that the 1957 final probate order definitely divested the Petitioning Creditors of their shifting executory interest.  *Garza II*, 87 S.W.3d at 632 n.1.   It alternatively noted that, due to the status of Texas probate court jurisdiction in 1957, the court that issued the 1957 final probate order lacked jurisdiction to divest the Petitioning Creditors of their shifting executory interest. *Garza II*, 87 S.W.3d at 632. Thus, the 1957 final probate order was void to the extent it sought to divest the Petitioning Creditors of their shifting executory interest. *Garza II*, 87 S.W.3d at 632.

The San Antonio Court of Appeals held that, as a result, the action brought by the Petitioning Creditors was not an impermissible collateral attack on the 1957 final probate order. If the 1957 final probate order did not divest the Petitioning Creditors of their interest, the lawsuit was not a collateral attack at all. If the 1957 final probate order did attempt to divest the Petitioning Creditors of this interest, it was void to that extent, and therefore a collateral attack was permissible.

The San Antonio Court of Appeals specifically declined to rule on the ultimate issue—who was in fact entitled to the land, the Debtor or the Petitioning Creditors. This issue was not ultimately determined until the Petitioning Creditors received summary judgment in the state court title action on December 8, 2005. (ECF No. 47-5).

## II.   Petitioning Creditors' Proofs of Claim Nos. 2-10

### a.  Procedural Posture

As noted above, the November 16, 2012 Memorandum Opinion did not resolve the issue of what to do with the remaining claims alleged in the Trespass and Property Damages Proofs of Claim (Nos. 2-10). The Petitioning Creditors have again moved for summary judgment on these proofs of claim. (ECF No. 171).

### b.  The Petitioning Creditors' Motion for Partial Summary Judgment

In the November 16, 2012 Memorandum Opinion, the Petitioning Creditors argued that the Debtor trespassed in bad faith for the entire period that he occupied the land. (ECF No. 53). The Court rejected the argument that the Petitioning Creditors were entitled to summary judgment on the issue of whether Debtor trespassed in bad faith—at least for the period prior to entry of summary judgment in the state court title action on December 8, 2005. (ECF No. 129 at 27-28).

The Court did hold that the measure of damages for a "bad-faith" trespasser who allows a third-party onto the land to conduct mining or other operations would be gross revenues from those operations, not net revenues.  (ECF No. 129 at 24-25).

The Petitioning Creditors' new Motion for Partial Summary Judgment addresses the amount of damages to which they are entitled as a result of Debtor's trespass regardless of whether or not the trespass was in "good-faith" or "bad-faith" prior to December 8, 2005.

### i.  Petitioning Creditors' First and Second Theories

The first theory is that, whether or not Debtor was a "good-faith" trespasser prior to December 8, 2005 (a fact the Petitioning Creditors dispute), any trespass from that point forward was necessarily in "bad-faith".  As a result, the Petitioning Creditors argue they are entitled to gross revenues under the SWDA for all periods after December 8, 2005.   The Petitioning Creditors' related second theory is that they should at least be entitled to net revenues for the period after December 8, 2005 (which is the measure of damages the Court found applicable to a "good-faith" trespasser who conducts commercial operations, or allows a third-party to do so, on another's land).

In other words, the first and second theories seek to collect from Debtor the revenues (if not gross, then at least net) earned by Dewey Bellows under the SWDA after December 8, 2005. The Petitioning Creditors stated the combined theories as follows:

> As a matter of law Petitioning Creditors are entitled to judgment for bad faith trespass against Debtor for SWDA gross revenues after rendition of Judgment for title on December 8, 2005, totaling $1,003,305.57, less a credit of $81,041.86 for payments by Bellows in DC-07-0391, for a total of $922,263.71.  Or if bad faith is not established as a matter of law, Petitioning Creditors are entitled to no less than post-judgment net revenues from the SWDA totaling $615,531.87, and a trial for additional actual liquidated damages for bad faith trespass totaling $306,731.84.

(ECF No. 171 at 3).[4]  The Petitioning Creditors' Motion for Partial Summary Judgment must be denied as to the first and second theories of recovery because they have not shown a lack of a genuine issue of material fact as to causation.

The Petitioning Creditors do not directly address the issue of causation, but the excerpt best capturing their theory appears to be the following:

> "On October 22, 2002, during the period of unlawful possession, the Debtor entered into a Saltwater Disposal Agreement ("SWDA") with Dewey Bellows." On October 8, 2005, PR 98-37(B) the State trial Court rendered Judgment holding that Petitioning Creditors had superior title to Debtor.    On or about October 24, 2007, in DC-07-0391, between Petitioning Creditors and Bellows, Bellows filed a sworn original answer and sought an injunction to prevent Petitioning Creditors from interfering with their "valid and subsisting" Salt Water Disposal Agreement. November 2, 2007, Bellows filed a Sworn Motion to Abate. At the end of November 2007, the SWDA expired and Bellows terminated operations. *None of this would have happened if Debtor had not signed the SWDA.*

(ECF No. 171 at 3-4) (emphasis added).  The last sentence touches on the key issue—whether the Petitioning Creditors successfully demonstrated that this injury (Dewey Bellows's continued unauthorized operations on the land after December 8, 2005) was substantially caused by the Debtor's trespass.

The stricter proximate cause standard (requiring foreseeability) is not applicable here, as this is an intentional tort instead of negligence. *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988).  Nevertheless, the question of causation is not simply whether "but-for" Debtor's trespass, the Petitioning Creditors' injury would not have occurred.  Even for torts governed by strict liability, producing cause must be shown. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 n.1 (Tex. 1991).

---

[4] In the state court action between the Petitioning Creditors and Dewey Bellows, a directed verdict was issued in favor of the Petitioning Creditors as to trespass by Dewey Bellows for the last month of the SWDA (October 2007). (ECF No. 30, Ex. B-8 at 1).  The Petitioning Creditors were awarded $81,041.86.  The Petitioning Creditors acknowledge that Debtor must receive this amount as a credit. (ECF No. 171 at 4).

The Texas Supreme Court has used various methods to distinguish "but-for" causation from producing cause. *See Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156 ("The element common to both proximate cause and producing cause is actual causation in fact. This requires proof that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred."); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) ("Defining producing cause as being a substantial factor in bringing about an injury, and without which the injury would not have occurred, is easily understood and conveys the essential components of producing cause that (1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred."). The Petitioning Creditors' statement that their injury would not have occurred but for Debtor's trespass (and signing of the SWDA) merely shows "but-for" causation, or causation in the "philosophical sense":

> The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense" yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

*Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470.

The Petitioning Creditors have not shown a lack of a genuine issue of material fact on this point. Indeed, it is not really addressed. The Court does not have enough evidence about the interaction between the parties after December 8, 2005 to determine causation.

When the Petitioning Creditors received a final judgment in their title action against the Debtor, the rights of Dewey Bellows were extinguished:

> A final judgment that establishes title or right to possession in an action to recover real property is conclusive against the party from whom the property is recovered and against a person claiming the property through that party by a title that arises after the action is initiated.

TEX. PROP. CODE § 22.003.  It is now clear that the Debtor never had any rights to the property. Even if the Debtor did have rights at one time, once the Debtor lost those purported rights, so did Dewey Bellows.

Imagine that Dewey Bellows was aware of this fact (or aware that the Debtor never had any rights to the property).  Yet instead of leaving and suing Debtor for breach of contract or warranty of title, Dewey Bellows decides to remain on the land and force the Petitioning Creditors to go forward with eviction proceedings.  This would certainly affect the causation analysis.  In such a situation (a flagrant violation of the Petitioning Creditors' rights absent any colorable legal justification), the Debtor's trespass might not be a substantial cause of the Petitioning Creditors' injury.

The Court is simply not able to determine at this point that there is a lack of a genuine issue of material fact as to causation.  The Petitioning Creditors must be prepared to address the issue at trial.

### ii.   The Petitioning Creditors' Third Theory

In the alternative, the Petitioning Creditors argue that they are at least entitled to the net revenues from the SWDA prior to the December 8, 2005 judgment in the title action.

The Court agrees with the Petitioning Creditors.  Regardless of whether it was in good-faith or in bad-faith, the Debtor trespassed on the Petitioning Creditors' land from October 19, 1984 (the day of Santiago Rodriguez Jr.'s death) to the day Debtor left the land (presumably shortly after December 8, 2005).  The Debtor's trespass was a substantial cause of the Petitioning Creditors' injury (Dewey Bellows's unauthorized saltwater operations), at least until December

8, 2005. As a result, the Petitioning Creditors are entitled to at least the net revenues related to the SWDA until December 8, 2005.

At this point, the Petitioning Creditors have not established the value of Dewey Bellows's net revenues related to the SWDA for this period. The Petitioning Creditors acknowledge that they are unable to sufficiently establish these amounts. (ECF No. 171 at 8-9). The issue of the amount of these damages will be reserved for trial.

Nothing in this opinion prevents the Debtor or Dewey Bellows from arguing that the Petitioning Creditors' claims should be reduced or subordinated for their alleged bad-faith litigation tactics.

### c. The Debtor and Dewey Bellows's Rule 56 Motion

The Debtor and Dewey Bellows filed a joint motion that, in part, sought a continuation of the date by which they needed to respond to the Petitioning Creditors' Partial Motion for Summary judgment. (ECF No. 177). This is a Rule 56 request for delayed consideration of a motion for summary judgment to allow additional discovery.

The Debtor and Dewey Bellows argue they need additional discovery on three issues: (i) whether the Petitioning Creditors' lawyers had authorization to file the proofs of claim and/or the involuntary bankruptcy petition; (ii) DNA testing to indicate the Debtors' good-faith belief that he was Santiago Rodriguez Jr.'s biological son; and, (iii) information relevant to their equitable subordination and fee recovery arguments.

The Court need not rule on the Rule 56 Motion. The first and third issues relate to whether there are additional defenses or reasons why the Petitioning Creditors' claims should be subordinated or otherwise disallowed (even if otherwise valid claims). This Memorandum Opinion does not prevent the Debtor or Dewey Bellows from making these arguments at trial.

The second issue (which relates to "good-faith" versus "bad-faith" trespass) is not addressed in this Memorandum Opinion.

### d.  Summary

The Petitioning Creditors' Motion for Partial Summary Judgment is disallowed as it relates to Claim Nos. 2-10 in all respects, with the exception that the Petitioning Creditors have demonstrated that they are at least entitled to net revenues related to Dewey Bellows's SWDA operations prior to December 8, 2005.

The issue of the amount of net revenues for this period will be addressed at trial.

This does not foreclose any argument from Dewey Bellows or the Debtor that, although the Petitioning Creditors would otherwise be entitled to these amounts, their alleged bad-faith conduct indicates these claims should be disallowed or otherwise subordinated.

### III.   Petitioning Creditors' Proofs of Claim Nos. 11-19

### a.  Procedural Posture

These claim objections were not originally part of this adversary proceeding.

The Petitioning Creditors filed Claim Nos. 11-19 on September 23, 2011.  (*See, e.g.*, Claim No. 13-1).  These claims seek to recover royalties that the Petitioning Creditors allege the Debtor converted.  The Debtor timely objected to Claim Nos. 11-19.  (ECF Nos. 187-195).[5]

After withdrawing their previously filed motions for summary judgment, the Petitioning Creditors again moved for summary judgment as to Claim Nos. 11-19 on July 25, 2012.  (Case

---

[5] Dewey Bellows joined in these objections. In the November 16, 2012 Memorandum Opinion, the Court ruled that Dewey Bellows had standing to object to the Trespass and Property Damages Proofs of Claim (Claim Nos. 2-10) because of the indemnification agreement contained in the SWDA. (ECF No. 129 at 14-15). The indemnification analysis does not appear to be applicable here because, in contrast to claims for polluted land, claims for converted royalties cannot be said to arise from Dewey Bellows's SWDA operations.   Subsequent to the November 16, 2012 Memorandum Opinion, Dewey Bellows filed a claim against the Debtor. (Claim No. 20). That Dewey Bellows is a creditor (and the estate may have assets to distribute), that the Trustee did not raise these objections on behalf of the Estate, and that the Petitioning Creditors appear to be arguing that Dewey Bellows must also indemnify Debtor for converted royalties indicate that Dewey Bellows is in fact a "party-in-interest" as to these claim objections.

No. 10-70606, ECF Nos. 262-270).  A full evidentiary hearing was held before Judge Schmidt on September 19, 2012.  (Case No. 10-70606, ECF No. 316-17).

### b.  Debtor's Original Objections

#### i.  Debtor's standing to object

The Petitioning Creditors questioned the Debtor's standing to object to their proofs of claim.  (*See, e.g.*, Case No. 10-70606, ECF No. 208).  Judge Schmidt overruled the Petitioning Creditors' arguments and found that the Debtor did have standing to object.  (Case No. 10-70606, ECF No. 339).

#### ii.  Adversary proceeding required

Debtor's first objection is that Rule 7001 requires an adversary proceeding for conversion claims.  The Debtor cites two Fifth Circuit opinions, *In re Village Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) and *In re Haber Oil Co.*, 12 F.3d 426, 437 (5th Cir. 1994), in support.

The Debtor is correct that a conversion claim seeking to recover converted property from the estate, or a conversion claim that also seeks to impose a constructive trust over property of the estate, must be brought as an adversary proceeding.  However, a proof of claim, seeking damages related to the tort of conversion, need not be filed as an adversary proceeding.

#### iii.  Noncompliance with FRBP 3001(c)

Debtor argues that the Petitioning Creditors did not comply with Rule 3001(c) by failing to attach the underlying state court lawsuit to the proof of claim.  (Case No. 10-70606, ECF No. 187 at 3).  The Court rejects Debtor's argument that the state court petition qualifies as a writing upon which these claims are based (as opposed to, for example, a contract).   Even if it did, it would not mean that the claim should be disallowed.  *See In re Today's Destiny, Inc.*, 2008 Bankr. LEXIS 3577 at *16-17, 2008 WL 5479109 at *3-*4 (Bankr. S.D. Tex. Nov. 26, 2008).

#### iv.  Res Judicata

Debtor argues that estoppel, claim preclusion, issue preclusion, res judicata and/or collateral estoppel bar the Petitioning Creditors' actions because "based on information and belief, one or both of the following payments were made pursuant to court orders." (Case No. 10-70606, ECF No. 187 at 3). The Debtor then references the payment summary attached to the Petitioning Creditors' Proofs of Claim. (Claim No. 10-1 at 2-11).

Even assuming these are theoretically valid affirmative defenses, the burden is on the Debtor to demonstrate their applicability. The Debtor has failed to do so. The defenses are rejected.

#### v.  Statute of Limitations

Debtor's fourth objection is that the statute of limitations bars the Petitioning Creditors from collecting these royalties. This objection is also addressed in the posthearing brief. The Court will address this defense in connection with its analysis of that brief.

#### vi.  Claim Overstated

Debtor argues that the amount of mispaid royalties claimed by the Petitioning Creditors ($833,338.71) is grossly overstated. After Debtor timely objected to the claim, the burden is on the Petitioning Creditors to prove that the Debtor did in fact receive the amount of royalties claimed. Whether the Petitioning Creditors met this burden at the evidentiary hearing is addressed later in this opinion, thereby also addressing this objection.

#### vii.  Other Defenses

Debtor lastly objects on the grounds of laches, payment, and/or release. (ECF No. 187 at 3-4). The Debtor does not explain how any of these other defenses are applicable, with the possible exception of a credit for the settlement agreement (discussed below). The duty is on the

Debtor to establish the applicability of any affirmative defenses. To the extent these objections do not relate to a credit for the settlement agreement, they are overruled.

### c.  Petitioning Creditors' Posthearing Brief

The Petitioning Creditors' Motion for Partial Summary Judgment primarily focused on Claim Nos. 2-10. To the extent it touched on Claim Nos. 11-19, it is a posthearing brief—as an evidentiary hearing was already held and the evidentiary record was closed. The Petitioning Creditors' arguments relating to Claim Nos. 11-19 argue that they successfully demonstrated their entitlement to the royalties listed in their Proofs of Claim at the evidentiary hearing, and that the alleged affirmative defenses are inapplicable.

Absent any applicable affirmative defenses, the Petitioning Creditors are entitled to all royalty payments made to the Debtor that they were able to prove at the evidentiary hearing.

At the evidentiary hearing, the parties disputed whether or not the December 8, 2005 grant of summary judgment in favor of the Petitioning Creditors in the title action should be read to indicate (either explicitly or by implication) that the Petitioning Creditors are entitled to royalties paid from the date of Santiago Rodriguez Jr.'s death. The summary judgment entered by the state trial court in the title action is not clear on this issue.

The lack of specificity does not affect the outcome. As discussed above, *Garza I* and *Garza II* indicate that there are only two possible ways of interpreting the 1957 final probate order. Both interpretations arrive at the same result.

It is possible that the 1957 probate court order did not divest the Petitioning Creditors of their shifting executory interest. If so, the land, and the right to the royalties, passed to the Petitioning Creditors immediately upon Santiago Rodriguez Jr.'s death. *See Deviney v. Nationsbank*, 993 S.W.2d 443, 448 (Tex. Ct. App.-Waco 1999) (citing *Peveto v. Starkey*, 645

S.W.2d 770, 772 (Tex. 1982)).

If the 1957 probate court order did attempt to divest the Petitioning Creditors of their shifting executory interest, the judgment was void to that extent. Void judgments are legal nullities that neither confer nor deprive anyone of rights. *Roccaforte v. Jefferson Cty*, 341 S.W.3d 919, 922 (Tex. 2011) (quoting *Lindsay v. Jaffray*, 55 Tex. 626 (Tex. 1881)) ("A void judgment is in legal effect no judgment."). This renders the result the same as in the first scenario—the land, and the right to the royalties, passed to the Petitioning Creditors upon the death of Santiago Rodriguez, Jr.

"The elements of conversion are (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Khorshit, Inc. v. Christian*, 275 S.W.3d 748, 759 (Tex. App.-Dallas 2008). Beginning from the standpoint that the Petitioning Creditors were entitled to the land (and the royalties) from the date of Santiago Rodriguez Jr.'s death, there is no question that the elements of conversion are satisfied.

The only remaining questions are whether there are applicable affirmative defenses, and whether the Petitioning Creditors were able to demonstrate that Debtor received the amount of royalties listed in their proofs of claim.

### d. Debtor and Dewey Bellows's Joint Motion for Partial Summary Judgment

The Debtor and Dewey Bellows filed a joint Motion for Partial Summary Judgment on March 14, 2013. (ECF No. 164). The motion was filed after the evidentiary hearing held before Judge Schmidt and also after the claim objections were consolidated with this adversary

proceeding. At a status conference on February 25, 2013, the Court indicated that the evidentiary record was closed as a full evidentiary hearing on the claim objections had been held before Judge Schmidt. Nevertheless, parties were allowed to file posthearing briefs (as long as they did not seek to introduce new evidence).

The Court will treat the Motion for Partial Summary Judgment as a posthearing brief. The motion addresses two affirmative defenses: (i) whether Texas's relation back statute precludes the Debtors' statute of limitations defense; and, (ii) whether the Debtor should get credit for a settlement agreement. These are also the two affirmative defenses contained in Debtor's original objection that are not yet overruled.

### i.  Statute of Limitations

Under either theory of events set forth in *Garza I* and *Garza II*, the Petitioning Creditors had a right to bring a cause of action for trespass against Debtor the moment Santiago Rodriguez Jr. died. Once the first royalty payment was "mispaid" in November 1987, the Petitioning Creditors similarly had a right to bring a conversion action.

The Petitioning Creditors first filed suit on July 8, 1986. (ECF No. 164-7 at 5). The first petition filed by the Petitioning Creditors sought only to establish ownership over the land and to have it partitioned amongst themselves. (ECF No. 164-7 at 2-5). There was no mention of the alleged converted royalties, as the first alleged conversion did not occur until November 1987.

The Petitioning Creditors amended the lawsuit on several occasions. The first amended petition that supports the Petitioning Creditors' claims for oil and gas royalties is the March 10, 1995 petition. (ECF No. 164 at 6). The statute of limitations for conversion is two years. TEX. CIV. PRAC. & REM. CODE § 16.003(a). Absent an applicable exception, the statute of limitations bars the Petitioning Creditors from recovering royalties converted prior to March 10, 1993.

An exception to the statute of limitations is Texas's "relation-back" rule:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM. CODE § 16.0068. The parties dispute whether the March 10, 1995 amended petition relates back to the July 8, 1986 original petition. The issue turns on whether the cause of action for converted royalties arises out of the same transaction or occurrence that was the basis for the 1986 petition.

One case cited by Debtor and Dewey Bellows in support, *Brewster v. Columbia Med. Center of McKinney Subsidiary, L.P.* is an example of a court applying a very narrow construction of the phrase transaction or occurrence. 269 S.W.3d 314 (Tex. Ct. App.-Dallas 2008). In *Brewster*, a plaintiff initially sued a doctor and a hospital for skin infections suffered in an Internal Care Unit ("ICU") of the hospital. 269 S.W.3d at 315. Prior to being transferred to the ICU, the plaintiff was first admitted to the Progressive Care Unit ("PCU") for chest pain and shortness of breath. (*Id.*). Plaintiff was transferred from the PCU to the ICU when his condition worsened and he suffered cardiac arrest. (*Id.*). The Dallas Court of Appeals refused to allow relation back when the Plaintiff attempted to amend the petition to add causes of action related to the care received while in the PCU (related to the heart attack). Although the causes of action arose from the same hospital visit, alleged deficiencies in the care given by the hospital and its staff, and in many cases involved the actions of the same health care individuals, these were held to be different transactions or occurrences. (*Id.* at 319).

The Petitioning Creditors cite *Leonard v. Texaco, Inc.* as their main case in support. 422 S.W.2d 160 (Tex. 1967). That case is easily distinguishable. In *Leonard*, the plaintiff filed an

original petition alleging an excessive and unreasonable use of the surface estate by a lessee who conducted seismic operations. The Texas Supreme Court held that the plaintiff's amended petition, which added a breach of contract cause of action based on the lessee's alleged promised to repair damage caused by seismic operations, was not barred by the statute of limitations. The *Leonard* case is an example of one action (seismic operations) producing two separate causes of action. This case, as alleged by the Petitioning Creditors themselves, is not an example of one action resulting in multiple causes of action.

This situation might be analogous to the *Leonard* case if one act (Debtor's unlawful possession of the land) resulted in multiple causes of action initially (say, for example, trespass and converted royalties causes of action). The Petitioning Creditors' own description of this case indicates this is not so. Although Debtor was in possession of the land since 1984, it was not until Debtor took subsequent affirmative acts that he was able to successfully convert the Petitioning Creditors' royalties:

> During this litigation, Debtor used various means to steal Creditor's mineral royalties paid by oil companies producing minerals from this lease covering the land Creditor owned. These payments are detailed in the Affidavit of Harvey Graeve, and the check from District Clerk of the Starr County to Gabriel Rodriguez.

(Case No. 10-70606, ECF No. 249 at 3-4). The acts complained of by the Petitioning Creditors include perjury, fraudulent misrepresentations, and forged documents. These acts are entirely separate, and often remote in time, from Debtor's continued occupation of the land after Santiago Rodriguez Jr.'s death.

The December 1988 correspondence between Debtor and Sun Exploration (a company connected to a majority of the royalty payments) is but one example that clearly indicates the distinction. Debtor was in possession of the land at that time (as he would be for approximately

the next seventeen years). Mere possession was not enough to convert the royalties. Sun Exploration contacted Debtor in December 1988 requesting a copy of his adoption papers, stating that they were necessary in order to make royalty payments to him. (Case No. 10-70606, ECF Nos. 249-9). The Petitioning Creditors allege that Debtor subsequently lied to Sun Exploration and sent forged birth records in response, and that these actions enabled him to continue to receive the royalty payments. (Case No. 10-70606, ECF Nos. 249-10).[6]

The causes of action complained of in the March 10, 1995 opinion do not relate to the same transaction or occurrence that gave rise to the causes of action listed in the 1986. As a result, the statute of limitations bars the Petitioning Creditors from recovering royalties paid prior to March 10, 1993.

### ii. Credit for the 1996 Settlement Agreement

On June 20, 1995, the Petitioning Creditors amended their state court petition once again and joined Sun Exploration and Oryx Energy Co. (ECF No. 164-10). The newly amended petition brought numerous causes of action against the various defendants, including conversion of royalties, conspiracy to convert royalties, fraud, gross negligence, and grossly negligent misrepresentation. (ECF No. 164-10 at 10-13).

The Petitioning Creditors settled with Sun and Oryx on March 26, 1996. (Case No. 10-70606, ECF No. 328-6 at 8). The Petitioning Creditors received $200,000.00 from the settlement. (Case No. 10-70606, ECF No. 328-6 at 3).

At the hearing, the Petitioning Creditors' attorney acknowledged the existence of the settlement agreement, but did not indicate or provide any proof of how the settlement agreement

---

[6] It is unclear why the Petitioning Creditors allege that Debtor lied and filed a false birth certificate, as it appears Sun Exploration only wanted to verify that Debtor was adopted by Santiago Rodriguez, Jr.—not that he was a biological son.

allocated the $200,000.00 amongst the various claims.  As a result of this acknowledgement, the burden shifted to the Petitioning Creditors to show that these amounts should not be credited to the claims for conversion of royalties.  *Utis v. Short*, 81 S.W.3d 822, 828 (Tex. 2002) ("Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amount should not be credited because of the settlement agreement's allocation.") (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998)).

The Petitioning Creditors failed to meet this burden.  As discussed below, the issue is mainly theoretical due to the small amount of (recoverable) royalties outstanding on the date of the settlement agreement.  To put it another way, the Petitioning Creditors' failure in this regard did not cost them $200,000.00, but merely $15,746.73 (plus interest).

### e.  Converted Royalties Proven by the Petitioning Creditors at the Evidentiary Hearing

The Court will first address the amount of converted royalties demonstrated by the Petitioning Creditors, before subtracting out amounts for which there are applicable defenses. Finally, the issue of interest will be addressed.

The Petitioning Creditors allege a total of $833,338.71 in converted oil, gas, and mineral royalties (plus interest).  (Claim No. 15-1).[7]  The Petitioning Creditors failed to introduce sufficient evidence at the evidentiary hearing to justify the entire amount claimed.

The only person to testify at the evidentiary hearing who might have had personal knowledge of the royalty payments actually received was the Debtor himself.  The Debtor's testimony indicated a lack of personal knowledge of the dates and amounts of royalty payments received, although he did acknowledge having received royalty payments in various amounts

---

[7] Some of the payments listed are actually for rent payments, not oil and gas royalties.  (Claim No. 15-1 at 12-13). These amounts will be deducted in any event for the reasons discussed below.

over the years:

> **Womble [Petitioning Creditors' attorney]:** Now, do you have any idea how much royalties you collected over that period of time?
>
> **Debtor:** Can I give you that amount?
>
> **Womble:** Do you have any way of knowing exactly how much you received over that period of time?
>
> **Debtor:** (Response inaudible).
>
> **Womble:** Say that again?
>
> **Debtor:** Yes
>
> **Womble:** In your proffer it says, "I do not know the date that I received or the amounts I received." So you when you made this proffer and signed it, that was a lie, that you did – you actually do know the dates and you do know the amounts?
>
> **Debtor:** Oh, no, sir.
>
> **Womble:** So you don't know the dates or the amounts.
>
> **Debtor:** I only know the amount that was discussed here in court.
>
> **Womble:** Oh, so the extent that you've been informed by various documents of what the amounts were, that's the only knowledge you have of the actual amounts.
>
> **Debtor:** Yeah.

(Case No. 10-70606, ECF No. 333 at 175). This does not establish the amount of royalty payments actually received by the Debtor, although it is an admission that he received some royalty payments over the years.

The affidavit of Harvey J. Graeve, an employee of Kerr-McGee Oil, was admitted into evidence without objection. (Case No. 10-70606, ECF No. 321 at 2). The affidavit attached computer printouts of accounting records of royalty payments made to Gabriel G. Rodriguez and his mother Olivia Rodriguez from 1984 to 2006. (Claim No. 15-1 at 15-53) The affidavit states that Kerr-McGee Oil (and its wholly-owned subsidiaries) paid Gabriel Rodriguez $656,809.49 in

royalty payments since November 1, 1987. (Claim No. 15-1 at 15-53). This appears to be a typographical error, as the Petitioning Creditors allege (and the Court's own calculation arrives at) a figure of $656,859.49.

The Court finds that the Petitioning Creditors did not produce at the evidentiary hearing evidence sufficient to support the remaining amounts claimed (which is everything not contained in the Graeve affidavit). The Petitioning Creditors payment summary merely lists additional royalty payments, often noting that the records were produced in prior state court litigation. (Claim No. 15-1 at 10-12). This is insufficient.

The Petitioning Creditors' state court attorney (Craig Smith) initially testified that he had personal knowledge of the Debtor having received every royalty payment as alleged. After Judge Schmidt noted the incredible nature of such an assertion, Smith acknowledged that what he initially referred to as "personal knowledge" was in fact a belief formed after reviewing the Graeve affidavit and documents admitted in the prior state court proceedings. (Case No. 10-70606, ECF No. 333 at 223-25). This is similarly insufficient.

The remaining royalties claimed ($176,479.22, or $833,338.71 minus $656,859.49) were not substantiated by evidence admitted at the evidentiary hearing. However, in Debtor's objection to the Petitioning Creditors' claims, he acknowledged receiving the royalty payment of $148,991.80 (described as a royalty check from the court registry). (Case No. 10-70606, ECF No. 187 at 30). Although the check itself was admitted into evidence at the hearing, the check does not indicate on its face that it is for royalty payments. (Case No. 10-70606, ECF No. 262-8 at 2).

Despite the issues with the evidentiary record, there is evidence to substantiate that Debtor received $805,851.29 out of the claimed $833,338.71. This figure, however, only

represents the amounts to which the Petitioning Creditors would be entitled absent any applicable defenses.[8]

### f. Amounts to be Offset

Because of the statute of limitations issue, the Petitioning Creditors are not entitled to any royalties prior to March 10, 1993. As alleged by Dewey Bellows, and verified by the Court's separate calculation, the amount of royalties paid to Debtor prior to this date is $501,353.69. Subtracting this figure from $805,851.29 leaves $304,497.60.

In addition, as described above, the Debtor is entitled to a credit because of the 1996 settlement agreement. Theoretically, Debtor would be entitled to a full $200,000.00 credit (or at least $100,000.00 as he was one of two nonsettling defendants) due to the Petitioning Creditors' failure to rebut the allocation presumption. However, only $15,746.73 in royalties were paid to the Debtor between the March 10, 1993 (the outer bounds for the statute of limitations) and March 26, 1996 (the date of the settlement agreement). The Debtor is thus receiving only a credit of $15,746.73 (plus interest) as a result of this.

Subtracting $15,746.73 from $304,497.60 leaves a total amount of collectible royalties of $288,750.87.

The following table breaks down the royalty payments by applicable category:

| Description | Amount | Status |
|---|---|---|
| Paid Prior to 3/10/1993 | $501,353.69 | Disallowed due to Statute of Limitations |
| Paid between 3/10/1993 and 3/26/1996 | $15,746.73 | Disallowed as subject to the Settlement Agreement credit |
| Paid after 3/26/1996 and covered by the Graeve Affidavit | $139,759.07 | Allowed |
| Paid after 3/26/1996, not covered by the Graeve Affidavit, but admitted | $148,991.80 | Allowed |

---

[8] All of the claimed amounts which the Petitioning Creditors were not able to substantiate (allegedly) occurred after 1996, and therefore would not have been subject to either of these affirmative defenses.

| by Debtor (Royalty Check) | | |
|---|---|---|
| Paid after 3/26/1996, not covered by the Graeve Affidavit, and not otherwise acknowledged | $27,487.42 | Disallowed due to insufficient evidence |
| **Total** | **$833,338.71** | |

### g.  Interest

Bankruptcy courts will allow prejudgment interest where state law so provides.  *See Asarco LLC v. Am. Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009).

"In Texas, there are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute." *Acad. Corp. v. Hansen*, 2002 Tex. App. LEXIS 1703 (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)).  It appears that the enabling statute, § 304.102 of the Texas Finance Code, is inapplicable here as this action is for the conversion of funds (an economic loss) and not damage to tangible property.  *Id.*, 2002 Tex. App. LEXIS 1703 at *26-27 (holding same in trespass and conversion action related to loss rental values from subject property).

In Texas, prejudgment interest is allowed in a conversion action where damages are definitely determinable.  *Imperial Sugar Co. v. Torrans*, 604 S.W.2d 73 (Tex. 2010) (citing *Tex. Co. v. State*, 154 Tex. 494 (1955)).  When prejudgment interest is requested under equitable grounds, it must be specifically pled.  *Vidor Walgreen Pharmacy v. Fisher*, 728 S.W.2d 353 (Tex. 1987).  The Petitioning Creditors specifically requested prejudgment interest as allowed by the law in the March 10, 1995 petition.

Although awarded under the equitable theory of prejudgment interest and not the enabling statute, it appears to be calculated in the same manner.  *See Hand & Wrist Ctr. Of Houston, P.A. v. Republic Servs.*, 2013 Tex. App. LEXIS 5281.

The Texas Finance Code indicates that the rate of prejudgment interest is equal to the postjudgment interest rate applicable at the time of judgment. TEX. FIN. CODE § 304.103. The applicable prejudgment interest rate is therefore 5%, as this is the currently applicable (state court) postjudgment interest rate. TEX. FIN. CODE § 304.003. Prejudgment interest is computed as simple interest and does not compound. TEX. FIN. CODE § 304.104.

When interest at a 5% simple rate from the date of the conversion is added to the amounts converted, the total amount of the judgment becomes $443,283.73. The Court's interest calculations will be attached to this Memorandum Opinion as an Exhibit.

### Conclusion

This Court will enter a separate order in accordance with this Memorandum Opinion.

SIGNED **June 15, 2013**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT

| | |
|---|---|
| **Equation Date** | 6/13/2013 |
| **Interest Rate** | 5% |

| | Date | Value at T0 | Simple Interest Total |
|---|---|---|---|
| **The Year 1996 (Remainder)** | | | |
| | 4/23/1996 | $30.14 | $55.97 |
| | 9/23/1996 | $32.69 | $60.02 |
| | 10/23/1996 | $46.22 | $84.67 |
| | 11/23/1996 | $36.67 | $67.02 |
| | 12/21/1996 | $34.36 | $62.67 |
| Total | | $941.06 | $330.36 |
| **The Year 1997** | | | |
| | 1/23/1997 | $45.97 | $83.64 |
| | 2/22/1997 | $68.29 | $123.97 |
| | 3/22/1997 | $56.68 | $102.66 |
| | 4/23/1997 | $31.26 | $56.49 |
| | 6/23/1997 | $44.64 | $80.29 |
| | 7/23/1997 | $25.50 | $45.76 |
| | 8/25/1997 | $29.66 | $53.09 |
| | 9/23/1997 | $26.01 | $46.46 |
| | 11/22/1997 | $55.44 | $98.57 |
| | 12/23/1997 | $32.29 | $57.27 |
| Total | | $415.74 | $748.20 |
| **The Year 1998** | | | |
| | 1/23/1998 | $29.61 | $52.39 |
| | 7/23/1998 | $107.15 | $186.92 |
| | 9/26/1998 | $28.00 | $48.60 |
| Total | | $164.76 | $287.91 |
| **The Year 1999** | | | |
| | 9/27/1999 | $73.45 | $123.80 |
| Total | | $73.45 | $123.80 |
| **The Year 2000** | | | |
| | 9/28/2000 | $28.73 | $46.99 |
| Total | | $28.73 | $46.99 |
| **The Year 2001** | | | |
| | 5/18/2001 | $148,991.80 | $238,904.21 |
| | 6/23/2001 | $207.92 | $332.38 |

|  | | |
|---|---|---|
| 7/23/2001 | $289.84 | $462.13 |
| 8/23/2001 | $140.50 | $223.43 |
| 9/24/2001 | $124.03 | $196.71 |
| 11/28/2001 | $140.94 | $222.27 |
| Total | $149,895.03 | $240,341.15 |
| **The Year 2002** | | |
| 2/23/2002 | $2,301.56 | $3,602.58 |
| 3/23/2002 | $592.89 | $925.57 |
| 4/23/2002 | $409.31 | $637.27 |
| 5/23/2002 | $336.72 | $522.85 |
| 6/24/2002 | $919.92 | $1,424.47 |
| 7/23/2002 | $198.09 | $305.94 |
| 8/23/2002 | $484.41 | $746.13 |
| 9/23/2002 | $236.49 | $363.27 |
| 10/23/2002 | $485.66 | $744.00 |
| 11/23/2002 | $283.60 | $433.28 |
| 12/23/2002 | $162.72 | $247.92 |
| Total | $6,411.37 | $9,953.29 |
| **The Year 2003** | | |
| 1/23/2003 | $121.92 | $185.25 |
| 3/24/2003 | $968.31 | $1,463.09 |
| 4/24/2003 | $889.75 | $1,340.68 |
| 5/23/2003 | $9,422.01 | $14,159.19 |
| 6/23/2003 | $12,619.70 | $18,912.02 |
| 7/23/2003 | $13,710.60 | $20,489.73 |
| 8/23/2003 | $7,508.49 | $11,189.74 |
| 9/23/2003 | $5,612.24 | $8,340.41 |
| 10/23/2003 | $5,410.19 | $8,017.60 |
| 11/23/2003 | $3,675.22 | $5,431.16 |
| 12/23/2003 | $3,355.76 | $4,945.09 |
| Total | $63,294.19 | $94,473.95 |
| **The Year 2004** | | |
| 1/23/2004 | $3,034.23 | $4,458.63 |
| 2/23/2004 | $2,760.07 | $4,044.27 |
| 3/23/2004 | $3,163.07 | $4,621.60 |
| 4/23/2004 | $3,461.94 | $5,043.85 |
| 5/24/2004 | $2,805.84 | $4,075.87 |
| 6/23/2004 | $2,421.71 | $3,508.12 |
| 7/23/2004 | $2,512.90 | $3,629.74 |
| 8/23/2004 | $4,119.47 | $5,933.18 |
| 9/23/2004 | $2,858.82 | $4,105.58 |

|  | 10/23/2004 | $2,932.54 | $4,199.23 |
|---|---|---|---|
|  | 11/23/2004 | $2,572.26 | $3,672.62 |
|  | 12/23/2004 | $2,273.95 | $3,237.22 |
| Total |  | $34,916.80 | $50,529.92 |
| **The Year 2005** |  |  |  |
|  | 1/24/2005 | $2,047.74 | $2,906.37 |
|  | 2/23/2005 | $2,639.92 | $3,736.22 |
|  | 3/23/2005 | $1,990.41 | $2,808.69 |
|  | 4/23/2005 | $1,825.53 | $2,568.42 |
|  | 5/23/2005 | $1,895.16 | $2,658.49 |
|  | 6/23/2005 | $2,366.27 | $3,309.49 |
|  | 7/23/2005 | $1,751.62 | $2,442.54 |
|  | 8/23/2005 | $2,657.54 | $3,694.72 |
|  | 9/23/2005 | $3,126.60 | $4,333.82 |
|  | 10/23/2005 | $3,792.91 | $5,241.59 |
|  | 11/23/2005 | $3,262.95 | $4,495.62 |
|  | 12/23/2005 | $3,906.27 | $5,365.70 |
| Total |  | $31,262.92 | $43,561.66 |
| **The Year 2006** |  |  |  |
|  | 1/23/2006 | $2,107.80 | $2,886.52 |
| Total |  | $2,107.80 | $2,886.52 |
| **Total** |  |  | $443,283.73 |